Fred McCABE, Appellant (Defendant),

v.

R.A. MANNING CONSTRUCTION CO.,
INC., Appellee (Plaintiff).

No. 83–55.

Supreme Court of Wyoming.

Dec. 2, 1983.

William L. Miller and Holly Brown of Central Wyoming Law Associates, P.C., Riverton, for appellant; oral argument by Miller.

Lawrence B. Hartnett of Hartnett & Moyer, Jackson, for appellee.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN, and CARDINE, JJ.

CARDINE, Justice.

This was an action to recover the balance due upon an oral contract for the construction of the Pioneer Press Building at Jackson, Wyoming. The jury returned its verdict in favor of plaintiff, appellee. Defendant, appellant, appeals from the judgment entered upon that verdict.

We will affirm.

The issues for determination, as stated by appellant, are the following:

"1. The trial court erred in refusing to admit into evidence the second page of the architect Hocker's notes of the November 26, 1980 meeting.

"2. The trial court erred in its comments regarding the testimony of Mr. Hocker.

"3. The trial court erred in refusing to allow appellant to cross examine Bob Manning, Sr. regarding problems with the Black house."

FACTS

Pioneer Press is a commercial printing business owned by appellant and located in Jackson Hole, Wyoming. The business received a thirty-day notice to vacate its premises and thereafter moved into a building housing the Jackson Hole Guide, a newspaper also owned by appellant. There was not sufficient space for both businesses; and appellant contacted appellee about April 6 or 7, 1980, concerning the construction of a building to house the Pioneer Press printing business. At that time, appellant had neither plans nor specifications for construction of the proposed building. He employed an architect to assist him and discussed with appellee, in a preliminary way, the construction of either a metal or concrete block, single story, 50′ by 100′ commercial building without basement. Appellant and appellee agreed to proceed with construction of the proposed building, without plans or specifications, upon a cost-plus oral contract under which appellee would be paid his cost of construction plus 5% for overhead and 10% profit. There is no dispute that this is the oral agreement entered into between the parties.

Construction was begun by appellee on May 23, 1980. By that time the architect had prepared a foundation plan with basement of sufficient strength and size to carry a second floor on the building if that were decided upon.

Appellee first gave an estimate of the cost of constructing a single story, 5,000 square foot concrete block building. Then, on June 29, 1980, he was asked to estimate the additional cost of adding a second floor to the building with six apartments, and he estimated that cost at $161,422.

As construction progressed, appellant's architect prepared drawings and delivered them to appellee. On August 7, 1980, appellee was asked to give an estimate of the cost of construction of the total building, still without final drawings being completed. He then gave an estimate of $440,037.71.

Construction of the building proceeded and, on November 7, 1980, appellant requested that appellee prepare another estimate of the cost of completion advising that he wished the entire building, with the exception of the apartment to be occupied by appellant, to be completed by the last day of January, 1981.

Appellee prepared the estimate pursuant to request, and the parties met on November 26, 1980. Present at the meeting were appellant, appellant's architect, and appellee. The parties discussed the progress being made, the proposed completion date, extra expense and cost resulting from changes as construction progressed, and the final cost of the project. Appellant asked appellee if he had arrived at a price for completion of the building. Appellee stated he had made an estimate for the cost of completion of $493,025.69. Appellant states that he asked for a "final" figure, and this is the figure given him by appellee. Appellee denies it was a "final" figure.

Appellant wrote the figure, $493,025.69, on a piece of paper, pushed it across the table and asked appellee to sign it. Appellee signed the paper and gave it back to appellant. This document, designated Exhibit C, was offered and received into evidence. When received in evidence, the figure, $493,025.69, was written twice, and there appeared thereon the word "final." Appellee testified the word "final" was not on the paper when he signed it. Appellant testified it contained the word "final" and that because the figure, $493,025.69, was smudged, he had written it again on the piece of paper marked Exhibit C.

Appellant contends that the effect of signing the paper and the meeting of the parties on November 26, was to change the oral agreement of the parties from cost-plus to a firm or fixed-bid contract. Appellee contends that nothing was ever said about changing the agreement from cost-plus to a fixed price. He testified the change would have been impossible without stopping the job, getting all the bills together, determining what had been paid and what had not been paid, and getting fixed firm bids from each of the subcontractors still to perform work. That was not done, nor was it requested.

Appellee continued work on the building and continued submitting bills in cost-plus form as he had done before, with the bills submitted in December being paid in full. When he submitted his bills on January 5, he was told by the bookkeeper who made payments that she, at that time, was unable to pay more than the $493,025.69. On January 5, appellant was still in the town of Jackson and had told his architect that he did not want the job stopped. The architect knew that appellant was contending that the agreement had been changed to a fixed-price contract. He never informed appellee of this contention. The bookkeeper never advised appellee that he would be paid no more than $493,025.69, or that the agreement had been changed. Appellant never called appellee and advised him of this, although appellant was in Jackson through the 7th of January before leaving on vacation for the Cayman Islands.

Appellee continued working on the job under the assumption that the agreement was as it had been initially. He completed the job as agreed at the end of January, 1981. Appellant returned from his vacation in March 1981 and thereafter, during April 1981, the parties met concerning the claimed balance due. Appellant, then for the first time, advised appellee that he would pay no more than the $493,025.69. Appellee became irate, left the meeting, and this lawsuit ensued.

Appellant's architect testified that it was not unusual for a general contractor to submit estimates during construction with a cost-plus contract. The estimates permit the owner to know the approximate cost of the building as work is progressing and determine whether to continue, stop work, or make changes to stay within his plans and budget. The architect further testified that it would be unusual to change an agreement from cost-plus to a fixed bid, and that he knew of it happening only one other time in his experience. He said there were problems in deciding changes in the building as work progressed. Plans were drawn and materials and specifications determined during construction, the last set of drawings being given to appellee on November 10, 1980. The job was termed "fast-track construction" which means there was some urgency about getting started and getting the building completed. Appellant had lost his lease for Pioneer Press, had moved into cramped quarters, and it was desirable that the new building for the commercial printing business be completed as soon as possible. This kind of construction is more expensive than construction which can be bid after the completion of plans and specifications for the structure to be built.

The Pioneer Press building, as finally completed, was an 11,000 square foot building with a full basement, a first floor occupied by the printing business, and a second floor containing six apartments.

Appellant has no complaint concerning the quality of construction, timeliness of completion, or the performance of appellee. He simply contends that the oral cost-plus arrangement was, by agreement of the parties, changed to a "fixed price" agreement and he should pay no more than that agreed fixed price ($493,025.69). The jury found against appellant upon this contention, and he claims that this finding resulted from error in the trial as specified in the issues he presents in this appeal.

I

REFUSAL TO ADMIT ARCHITECT'S NOTES.

Pretrial conference in this case was held June 8, 1982. Among other exhib-

its, appellant produced at the pretrial conference two pages of the architect's notes which were marked "Defendant's Exhibit B." These notes were prepared by the architect at or immediately after the meeting of the parties on November 26, 1980. The court's written Order After Pretrial Conference stated: "Defendant's [appellant's] exhibits b [and other exhibits] are all received into evidence without objection." This order was filed and served upon all counsel of record September 7, 1982.

At the trial, during the testimony of appellant's architect upon direct examination, the following occurred with respect to Exhibit B.

Appellant's counsel: "Now, Mr. Hocker, I will hand you Defendant's Exhibit B which has already been admitted into evidence * * *."

Appellee's counsel then approached the bench and, out of the hearing of the jury, stated:

"My notes from the pretrial conference don't show Exhibit B as being admitted. He is laying a foundation. He just said to the jury they had already been admitted into evidence."

The court then stated,

"That's an error on my part * * *,"

The court further stated,

"The problem with this exhibit is this page [referring to page two of Exhibit B] was not made contemporaneously with the other; it contains all his impressions. These are not statements, just conclusions."

Page two of Exhibit B contained the following statement:

"Bob will hold $493,025.69 figure. Initialed agreement."

Appellee's objection to the exhibit being received in evidence was that it contained the opinion and conclusion of the architect that the parties had entered into an *agreement* to complete the job for the amount stated. Appellant offered Exhibit B, both pages one and two, into evidence. Page one of Exhibit B (mostly factual and made at the time of the meeting) was received into evidence upon stipulation of the parties. Although the Order After Pretrial Conference stated that the second page of Exhibit B had been received into evidence without objection, the court modified the pretrial order and refused admission of the exhibit into evidence.

Rule 16, W.R.C.P., governing pretrial conferences, states in pertinent part:

"The court shall make an order which recites the action taken at the conference * * * and such order when entered controls the subsequent course of the action, *unless modified at the trial to prevent manifest injustice. * * *"* (Emphasis added.)

Although the court should be cautious, even reluctant, to modify its pretrial orders during trial, yet when circumstances require modification to prevent manifest injustice, the court has not only the right but an obligation to relieve counsel of his pretrial stipulations. In deciding whether to modify its pretrial order, the same principles which govern the exercise of discretion in permitting amendments to pleadings apply. Thus, the trial court has a broad discretion in determining whether to modify or amend its pretrial order during trial, and the decision of the trial court in this regard will not be disturbed absent an abuse of discretion. 62 Am.Jur.2d Pretrial Conference § 37.

Amendment of the pretrial conference order was approved in *Frontier Fibreglass Industries, Inc. v. City of Cheyenne,* Wyo., 435 P.2d 456 (1967); and when, in *Ford Motor Co. v. Kuhbacher,* Wyo., 518 P.2d 1255 (1974), the trial court permitted a witness, not disclosed or listed in the pretrial conference order, to testify contrary to the order on pretrial conference, we held there was no abuse of discretion. We stated:

"* * * Courts should generally recognize the binding effect of all matters in the pretrial orders, but this does not mean that there should be a rigid or pointless adherence to them in a trial but rather that avoidance of possible hardship to parties and the accomplishment of substantial justice to the merits of claims

should be among the factors which the trial court considers. * * * " 518 P.2d at 1260.

In this case the court had made a mistake in its preparation of its Order After Pretrial Conference and had erroneously shown Exhibit B as being admitted into evidence. Appellee's counsel should have discovered the mistake, but did not. The court was of the opinion that the conclusory statement of appellant's architect contained in page two of Exhibit B, i.e., that the parties had entered into a *new agreement* to complete the building for a fixed sum of $493,025.69, was the very essence of the litigation. Whether the parties had entered into such new agreement was the only question submitted to the jury for its determination. It was of such significance that admission into evidence of the architect's opinion of the parties' state of mind might result in manifest injustice in the case. The court, therefore, modified its Order After Pretrial Conference, setting aside the parties' purported stipulation under which the exhibit had been shown as received into evidence.

Whether the court should modify its pretrial conference order at trial, as was done here, relieving a party of his apparent stipulations, depends upon the particular facts and circumstances of each case. We have said the question is one addressed to the sound discretion of the trial court, and its ruling will not be disturbed absent an abuse of discretion. In this case a mistake had been made showing the exhibit admitted into evidence. That was not disputed. Under the circumstances, modification of the order was not an abuse of discretion.

## ADMISSION AS A BUSINESS RECORD

 Appellant next contends that even if the court could properly have modified the Order After Pretrial Conference to relieve appellee of the provision admitting Exhibit B into evidence, the court should nevertheless have admitted page two of Exhibit B as a business record. Rule 803, W.R.E., provides that business records are admissible into evidence even though the declarant is available to testify.[1] To be admissible, it is required by the rule, that

(a) it be the regular practice of that business activity to make the memorandum, and

(b) that the source of information does not indicate a lack of trustworthiness.

In this case appellant had asked for a meeting at which appellee was to submit his statement of cost of completion of the entire project. Appellant intended to change the agreement of the parties from a cost-plus contract to a fixed-price contract. The architect in appellant's employ was present. His conclusion, stated in Exhibit B, that the parties had made a *new agreement* must have been based upon his observation of the parties, their expressions and demeanor, and words spoken by them. The opinion that a new agreement had been made was crucial to appellant's case. The court might reasonably find that page two of Exhibit B lacked trustworthiness and should not be admitted.

There is a second reason page two of Exhibit B might be rejected. Where the business record contains *opinions,* it is, for purposes of admissibility into evidence, subject to the limits imposed by Rules 701 and 702, W.R.E.[2]

1. Rule 803(6), W.R.E., provides:
 "(6) *Records of regularly conducted activity.* —A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or

 circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling for every kind, whether or not conducted for profit."

2. Rule 701, W.R.E., provides:
 "If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a

Opinion evidence may be given by either a lay or expert witness. During much of the trial, appellant's architect testified as an expert in the area of his expertise.[3] However, when he proposed to testify that, based upon his observation of the parties, their appearance, demeanor, statements and what transpired between them, in his opinion, the existing agreement had been abandoned and a new agreement entered into, he would not be testifying as an expert witness. He would then have been testifying as a lay person in an area involving matters of common knowledge and experience generally and ordinarily possessed in common by lay persons.

Prior to adoption of the Wyoming Rules of Evidence, it was held error to admit opinion evidence upon an ultimate issue in the case. *In Re Estate of Carey,* Wyo., 504 P.2d 793 (1972). Such evidence was said to invade the province of the jury to decide that ultimate issue. The exclusionary rule, although of merit in some instances, was otherwise mostly confusing, disruptive, and an obstacle to presentation of testimony in a clear, understandable form. Rule 704, W.R.E.,[4] now allows receipt of this kind of opinion evidence if reliable and helpful to the jury; and that question, initially, is for the trial court to decide.

Thus, pursuant to Rule 701, W.R.E., the opinion of the architect, that the parties had entered into a new *agreement,* would be admissible if it was

"a. rationally based on the perception of the witness and

"b. helpful to a clear understanding of his testimony or the determination of a fact in issue."

It was the intent of the framers of the Rules of Evidence to considerably relax the prohibition against receipt of opinion testimony both by expert and lay witnesses. Generally, the rules should be liberally construed to allow the admission of such evidence. Yet, on occasion, we recognize that certain opinion evidence may not be helpful or may have a potential for such mischief that it ought to be rejected. Thus, it has been stated that:

"[i]t is a difficult question whether a witness should be permitted to give his opinion as to the unspoken knowledge, intent, understanding, or feelings of another person, or to the intended meaning of another in the words he speaks. * * *"

that the

" * * * helpfulness requirement calls for rejection of 'assertions which amount to little more than choosing up sides,' * * *"

and finally that,

"[t]he price may be too high to pay, however, if the witness [testifies to] * * * a conclusory term highly damaging to a party and relating to a hotly contested issue * * *." 3 Louisell and Mueller, Federal Evidence § 376 (1979).

The architect was in the employ of appellant. He helped in the preparation of his case. Surely he was on his side. Whether a new agreement had been made was a hotly contested issue. Whether his opinion was rationally based upon his perception is open to question. Regardless of this, the court felt, and we agree, that it would not have been helpful to a determination of the fact in issue.

It was not a complicated matter. The testimony of the parties as to what tran-

---

clear understanding of his testimony or the determination of a fact in issue."
Rule 702, W.R.E., provides:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

3. An expert witness is one having superior knowledge of a subject acquired by profession-

al, scientific, or technical training or by practical experience, or who possesses peculiar knowledge respecting the matter involved that is not ordinarily possessed by lay persons.

4. Rule 704, W.R.E., provides:
"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

spired at their meeting, what was said, what occurred, was clear and understandable and more than sufficient for the jury to reach its determination.

Had the architect been permitted to say "the parties made a new agreement," it would, in our judgment, have made little difference. The trial judge must have felt otherwise in excluding this opinion. Appellant does not raise sufficiency of evidence as an issue, nor does he contend the jury could not find as it did upon the evidence before them. He merely contends that the architect should have been allowed to give his opinion that a *new agreement* had been made between the parties either through the introduction of the second page of Exhibit B or through his testimony pursuant to the provisions of Rule 803(6), W.R.E.

Although Rule 701 permits receipt of this kind of opinion evidence,

" * * * conditions set for receipt of testimony of this sort—that it be helpful to the trier of fact and rationally based on the perception of the witnesses—are themselves generally defined, with a certain looseness about them which calls for the exercise of discretion by the trial judge." (Footnote omitted.) 3 Louisell and Mueller, Federal Evidence § 375 (1979).

Whether this type of evidence should be received in a particular case is a matter addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal absent abuse. We hold in this case that there was no abuse of discretion on the part of the court in refusing to receive this proposed opinion evidence and that prejudice did not result from its exclusion.

## II

### COURT'S COMMENTS REGARDING ARCHITECT.

Appellant contends that the trial court's comments, in the presence of the jury, demonstrated hostility toward his architect witness and conflicting instructions materially prejudiced his case. He further contends that the court was benevolent toward ap-

pellee and partial to his cause. We look to the record to determine whether the court made inappropriate comments or favored one party over the other.

Before the trial began and out of the jury's presence, there was a hearing on motions in the court's chambers. In ruling on a motion in limine, the court declared its concern about conclusory testimony when the following occurred:

"MR. HARTNETT: The thing that * * * concerns me * * * I did find, at [the architect's] deposition, he would tend to characterize what his impressions or understanding of what the parties said meant * * *.

"THE COURT: If he does that, I will admonish and if he persists, I will just put him in jail. I will expect that counsel will not allow him to do that because it's inappropriate. * * *

"MR. MILLER: * * * I agree with the Court * * * [the architect] may at times make a statement like Mr. Manning was surprised or Fred McCabe was surprised, which technically, is a conclusion.

* * * * * *

"MR. MILLER: I just simply want to inform the Court I have informed [the architect] about not doing that.

"THE COURT: [With respect to the architect] I don't know him at all and I can't even suggest—"

The trial began. It was appellee's turn first. He called the plaintiff, Manning, as his first witness. During his direct examination, the following occurred:

"Q. [By plaintiff's attorney] Mr. Manning, is there a reason why an owner would choose a fixed-price contract over a cost-plus contract? * * *

"MR. MILLER: Objection. That calls for an opinion as to why an owner would do that, Your Honor.

"THE COURT: Sustained.

* * * * * *

"Q. But he did say that it was okay?

"MR. MILLER: Objection. That is leading, Your Honor.

"THE COURT: Sustained."

\* \* \* \* \* \*

"Q. [By Mr. Hartnett]: Now, Mr. Manning—

"THE COURT: Let me go back and explain to the jury what happened there. The witness answered the question and then the counsel repeated the answer to the counsel's satisfaction \* \* \* in effect, putting words in the witness' mouth \* \* \*. The Court will always stop counsel from putting words into the witness' mouth. There is no reason for a lawyer having to repeat the answers that the witness already gave.

"MR. HARTNETT: Thank you, Your Honor.

\* \* \* \* \* \*

"Q. Okay. Do you remember what was discussed at that meeting?

"A. \* \* \* [W]e discussed the necessity of completing portions of the building for an open-house \* \* \* we discussed whether or not the 12th of December was a feasible date \* \* \*. It was decided that it was \* \* \*.

"MR. MILLER: Your Honor, I am going to object to him testifying any further. He is stating a conclusion.

"THE COURT: Sustained.

\* \* \* \* \* \*

"Q. [By plaintiff's attorney] Do you remember what else was said at that meeting?

"A. We had a discussion on the—

"MR. MILLER: Objection, again, Your Honor.

"THE COURT: Sustained. Ladies and gentlemen of the jury, what I anticipated through this trial is beginning to happen here. \* \* \* If a person testifies about a conversation \* \* \*, the most useful information \* \* \* will be to repeat the exact words that were said. \* \* \* If the witness is not able to recall the exact words \* \* \*, he is, in Court, permitted to give his recollection or the tenor of the conversation, but generally, in law, \* \* \* that is not as reliable testimony as if he can remember the exact words. \* \* \* "

"Q. Mr. Manning, where did that figure come from?

"A. That was an estimate on my part.

"MR. MILLER: Objection, Your Honor. That is a conclusion that that was an estimate. \* \* \*

"THE COURT: The objection is well taken. \* \* \*

\* \* \* \* \* \*

"Q. I am going to ask you again what you did with that figure at the meeting?

"MR. MILLER: Your Honor, that's been asked and answered.

"THE COURT: It calls for a conclusion of the witness in all events."

\* \* \* \* \* \*

"MR. HARTNETT: All I wanted him to say is that I handed it to Mr. McCabe.

"MR. MILLER: Objection, Your Honor \* \* \*.

"THE COURT: [To Mr. Hartnett] That's very reprehensible. \* \* \* "

Appellee next called a building contractor to testify in his case as an expert witness concerning the custom among contractors and architects on cost-plus jobs. The following occurred:

"THE COURT: \* \* \* [T]his witnesses' [sic] opinion as to what might be a standard in the business simply is of no assistance to the trier of fact in this case \* \* \*.

"MR. HARTNETT: I hear you, Your Honor.

"THE COURT: If you persist in putting in matter which the Court has told you is irrelevant, then I will discipline you for that.

"MR. HARTNETT: I understand that. \* \* \* I don't want to incur the Court's wrath. \* \* \*

\* \* \* \* \* \*

"MR. MILLER: I will object \* \* \*.

"THE COURT: Well, the Court would exclude those. \* \* \*

\* \* \* \* \* \*

"THE COURT: Ladies and gentlemen of the jury, \* \* \* what's transpired here just in the last few minutes \* \* \*, I have concluded that \* \* \* the business of being a building contractor, \* \* \* is not so

benign, * * * so far away from the everyday knowledge of ordinary people * * * that it requires expert testimony to explain * * * what the case is about * * *."

The witness was excused, the court not having allowed him to testify. We are unable to discern from the above a partial or benevolent attitude of the court toward appellee as is claimed by appellant.

Next it was appellant's turn. He called the architect to testify and the following occurred:

"Q. Can you tell the jury to the best of your recollection what was said.

"A. There was a discussion of—

"MR. HARTNETT: Objection, Your Honor. * * * [E]very time he starts to testify, he looks at his notes at that point. I don't know whether he is testifying to his recollection refreshed or whether he is reading the notes * * * I would object if he has to read the notes to the jury * * * after answering the question he recalls.

"THE COURT: Well, then also, Mr. Miller, * * * I perceive hat [sic] were [sic] going to have the same or more serious problems that we undertook yesterday. So if you wish me to lecture the witness, I will do that. * * * [T]he form of the questions * * * is * * * such * * * as to permit him to volunteer every personal opinion he might have * * *.

"Q. Now, I would ask you to refer to your notes and do your notes reflect what that estimate was?

"A. Yes, they do.

"MR. HARTNETT: Objection, Your Honor. * * * I anticipate that he is going to then ask him to read what the piece of paper says and I am going to object to this line of questioning . . . Could I take the witness on voir dire one more time?

"THE COURT: * * * [W]e get into a mechanical problem * * * of whether * * * we * * * have * * * the witness explore his own conscience as to whether he has testified to something he actually remembers now or whether * * * he has to go

back through his notes * * *. [G]o ahead with your voir dire at this time.

 * * * * * *

"Q. But in many cases, [to the architect], those notes reflect only your impressions of what was said at those meetings; is that not correct?

 * * * * * *

"A. In some.

"MR. HARTNETT: * * * [T]he problem * * * is that I almost feel like I ought to look at every note before he goes ahead and testifies because it may be what his opinion or his impression was of what was said.

 * * * * * *

"MR. MILLER: Your Honor, I am not sure where we were.

"THE COURT: You were talking about the end of the conversation; August 7, 1980 meeting and he testified, inappropriately, I thought, that Mr. Manning gave an estimate * * *.

 * * * * * *

"THE COURT: Ladies and gentlemen of the jury * * * When [the architect] says Mr. Manning gave him an estimated price for the change, obviously Mr. Manning did not say that * * *. [The architect] concluded that that's what he did. * * * [H]e could be entirely wrong and * * * that answer does not help you to resolve the case. * * * [T]he Court needs to know what the facts are, not your opinion."

The above is essentially what occurred before the jury during the trial that was claimed to have been prejudicial.

The trial court acts as a referee of the contest between the parties. It should be fair and impartial as between the parties and their attorneys and allow them considerable freedom in the presentation of their respective cases in their own way. That is true even though the court may feel that counsel is proceeding on the wrong theory or not emphasizing his strongest points or that the court would try the case differently. The court should not, under our rules of practice, convey to the jury its

own opinions of evidence or of the credibility of witnesses or the merits of the controversy. These matters specifically are for determination by the jury.

Juries see the court as an impartial, unbiased presider at the trial to whom they look for guidance. Thus, it is said,

"In the eyes of the jury the trial judge is the epitome of justice and wisdom. His influence upon the jurors is immense. A trial judge is obligated to maintain strict impartiality as between the adverse parties to a lawsuit. Jurors are quick to detect and respond to his slightest inclination toward or against either side of a lawsuit; to condemn the side which he condemns and to approve the party litigant or the cause upon which he smiles. *Wright v. Richmond,* 21 Mo.App. 76. It is easy for a trial judge, unintentionally, to prejudice a jury for or against one party or another. He must be extremely cautious in his comments, considerate in his rulings, and thoughtful, patient and forbearing in his conduct. * * * " *Harms v. Simkin,* Mo.App., 322 S.W.2d 930, 938 (1959); see also, *Ryan v. Ald, Inc.,* 146 Mont. 299, 406 P.2d 373 (1965).

Some of the court's comments were directed to the attorneys in the case. Thus, appellee's counsel was admonished by the court to stop repeating the witness' answers and putting words in the witness' mouth. Admonishment of counsel is so delicate and can result in such harm in the jury's eyes that this counsel replied, "Thank you, Your Honor." Again, after objection was sustained, appellee's counsel volunteered before the jury what testimony he sought from the witness, and the court stated, "That's very reprehensible."

When it came time for appellant's turn, after objection by appellee, the court advised appellant's counsel that his question created the same serious problems that had occurred earlier in the trial and that if he wished the court to do so, he would lecture the witness about them.

Although we have said that the court must assiduously avoid any appearance of partiality, we recognize also that

the court must be firm, maintain control of the proceeding and assure that what occurs is within the rules of law and procedure to the end that the jury receives and considers only lawful evidence conducive to its arriving at a just result. An attorney is an officer of the court and he should neither be complimented nor discredited before the jury; although where circumstances reasonably necessitate, it is within the province of the trial court to admonish or rebuke counsel. We recognize the problems which arise and must be dealt with in presiding at hotly contested trials. Maintaining a semblance of order in those trials is left largely to the trial court and is not a basis for reversal absent a clear showing of prejudice. It has been suggested by appellant that the court was partial, even benevolent, toward appellee. The record does not support that contention. We would find that this court showed no favoritism or partiality to either counsel, but treated everyone the same.

With respect to the court's comments and statements to the jury concerning the testimony of witnesses, most of that related to the court's firm and repeated effort to avoid opinion and conclusory testimony by witnesses. In the not too distant past, this type of testimony was prohibited. Thus, in Nichols Applied Evidence, Contracts (1929), citing cases which predate the Rules of Evidence, it was stated:

"A question asked a witness as to whether a negotiation was ever concluded by an agreement was properly excluded as calling for a conclusion. Where a witness had narrated the facts and circumstances of the transaction as he understood them, a question calling for his conclusion as to whether or not the contract was entered into was properly excluded. * * * " (Footnotes omitted.) Nichols, supra, Contracts, p. 1249.

The rules restricting admission of opinion testimony, although functional, were exceedingly cumbersome and difficult to apply. The remnants of those rules are with us yet to a greater or lesser extent; perhaps they always will be. The court in this case sustained numerous objections to what

it considered conclusory, and therefore inadmissible opinion testimony. Appellant contends that the effect of these objections, the rulings by the court, and lectures to the jury was to destroy the credibility of his architect, place the witness in a bad light before the jury, and was therefore prejudicial to his case. Appellant further contends that all of the court's remarks indicated a hostility toward this witness. We think appellant is mistaken in this conclusion and that the jury would not gather from what occurred any hostility on the part of the court. First the court said he did not know the witness. His remarks were not directed at the witness but at his manner of testifying; and the court's position, with respect to opinion or conclusory testimony, was explained in detail for the jury.

In *Kendrick v. Healy,* 27 Wyo. 123, 154, 192 P. 601, 612 (1920), we said:

" * * * But in nothing that the court said was there an expression of opinion or comment upon the truthfulness or credibility of the witness, nor were the remarks, in our opinion, so severe as to require that they be held prejudicial. * * * [T]he language of the court * * * was intended only as a caution to pay attention to the questions and answer so as to be heard, and that the occasion was not one for levity. That the court may properly do, without reflecting upon the character or credibility of the witness, if warranted by what has occurred. It occasionally happens that some occurrence upon a trial will warrant and may require comment by the court upon the conduct of a witness by way of caution, admonition, or censure, and, when such comment is within due bounds, and appropriate to the character of the occurrence, it will not be subject to a valid exception. [Citations.]" See also *Schaffner v. C.F. Massey Co.,* 270 Ill. 207, 110 N.E. 381 (1915).

In this case the comments of the court were not directed at the witness but at the proposed testimony. They did not go to the truthfulness of that testimony, nor did they affect his credibility.

Cases which have held judge's comments or involvement with the trial prejudicial are generally those in which the trial court interferred in the trial process by undertaking cross-examination of a witness in an effort to impeach or overcome other evidence detrimental to a party. There are also cases in which the court's characterization of a witness was extreme such as referring to him as an "unmitigated scoundrel" or comments that exceeded all that was reasonable. These cases are collected in 83 A.L.R.2d 1135–1147. This case does not approach the severity of those cases or a magnitude of transgression as would generally be held to be materially prejudicial to a party or affect the outcome of a trial.

### III

### REFUSAL OF CROSS–EXAMINATION.

During discovery, before trial, appellant had taken the deposition of appellee. He inquired whether appellee had any problem with construction of the "Black" house. Appellee testified there were no problems. Appellant subsequently learned that there had been difficulties during construction of this house. He contended that he should be allowed to impeach appellee with these facts and that such affected his credibility.

A motion in limine, before trial, to prohibit this proposed evidence was granted, the court holding that such was irrelevant to the issues unless it appeared that the Black house was constructed under a cost-plus arrangement in circumstances similar to those in the instant case so as to show a pattern of conduct on the part of appellee.

During trial, because of the order in limine, appellant advised the court that he wished to cross-examine appellee on the subject of the Black house. The court recessed the trial and retired to chambers to hear argument on appellant's request. Appellant was asked what questions he would propound and what he expected to prove, if permitted to inquire into this area. Appellant responded as follows:

"MR. MILLER: Your Honor, the first question that I would ask is if there were any problems with the Black House. Under oath, in his deposition, Mr. Manning said that there were no problems with the Black House. I am informed and I have another witness, Mr. Stafford, that there were numerous problems. Mr. Stafford is a former employee of Mr. Manning and was also the employee of Mr. Black during the construction of the Black house. Mr. Stafford can testify from his own personal knowledge that at one time, Mr. Manning—

\* \* \* \* \* \*

" * * * pulled all the workers off the job; and on another occasion plaintiff said to plaintiff's foreman that he would not have the men work a full eight hours if money were to be withheld plaintiff by Mr. Black, and it developed that Mr. Black did withhold money from the plaintiff. * * * "

The court ruled that problems with the Black house were not relevant nor material to the issues before the court, that the matter was not within the subject matter of direct examination, and denied appellant's request to cross-examine appellee on this matter.

■ The court's denial was, first, grounded upon the proposition that it was outside the scope of direct examination. Rule 611(b), W.R.E.,[5] provides that cross-examination should be limited to the subject matter of the direct examination. There was no testimony on direct examination concerning the construction of the Black

house. It was not an issue in the case. Although the court could, in its discretion, have permitted the cross-examination under this rule, it was proper also in these circumstances, and not an abuse of discretion, to refuse to permit this cross-examination.

The court also sustained an objection to this testimony upon the ground that it was irrelevant. Rules 401, 402, and 403, W.R.E.,[6] deal with admissibility of relevant evidence. It has been suggested that

"The only arguments for excluding evidence of other incidents that retain their cogency today are those involving the practical problems of prejudice and confusing the jury. Under the scheme of relevance provided in Article IV of the Federal Rules [and W.R.E.], these arguments go to the discretion of the judge to exclude evidence under Rule 403 rather than to any rule of exclusion such as existed at common law. If the other incidents have 'any tendency' to prove a consequential fact, they are relevant under Rule 401. The pre-existing rules of relevance dealing with such proof have been repealed by the adoption of Rule 402 * * * ." (Footnotes omitted.) Wright & Graham, Federal Practice and Procedure: Evidence § 5170.

■ We are not fully in accord with that view. When Rule 402, W.R.E., states specifically that, "Evidence which is not relevant is not admissible," that language has meaning and should be applied in a proper case. The Black house was a different type of building, being constructed under a different arrangement, perhaps with plans for its construction; the problems en-

---

5. Rule 611(b), W.R.E., provides:

"(b) *Scope of cross-examination.*—Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."

6. Rule 401, W.R.E., provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Rule 402, W.R.E.:

"All relevant evidence is admissible, except as otherwise provided by statute, by these rules, or by other rules prescribed by the Supreme Court. Evidence which is not relevant is not admissible."

Rule 403, W.R.E.:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

countered (holding workers off the job, withholding money) were vastly different from those in this case. Therefore, we agree with the trial court that what occurred during the construction of the Black house, as related to the court by appellant's counsel, was not relevant to any issue in the instant case and was properly excluded.

Finally, appellant contends that cross-examination of appellee concerning construction of the Black house should have been permitted for impeachment purposes and as affecting appellee's credibility. Appellee had not, on direct examination, testified concerning the construction of the Black house, and was not yet subject to impeachment on this subject. Thus, appellant's counsel advised the court that upon cross-examination,

" * * * [T]he first question that I would ask is if there were any problems with the Black House. * * * "

If the question were permitted and appellee answered there were no problems with the construction of the Black house, appellant would then impeach him with his deposition and by calling other witnesses. If appellee responded on cross-examination that there had been problems in the construction of the Black house, appellant's position then would be that appellee was also the cause of the problems with the construction of the Pioneer Press building.

Had the court permitted appellant to proceed as he requested, opening the subject of the Black house, then appellee should be granted the right to respond and offer proof of the entire history of construction of the Black house; he might show that the problems were to be expected, not unusual, or that there were no problems at all, and call numerous witnesses with respect to this area of dispute. There would be a trial within the trial.

Rule 611(a), W.R.E., vests in the court a duty to exercise reasonable control over the presentation of evidence to avoid needless consumption of time. Rule 611(b) places a discretion in the court in allowing additional matters on cross-examination. Rule 403, W.R.E., supra fn. 6, permits the court to exclude even relevant evidence if its admission will result in undue delay, waste of time, be cumulative, cause confusion, mislead the jury, or present a danger of unfair prejudice. The rules vest in the court a large discretion which is necessary to an efficient and orderly trial process. The court in this case did not abuse its discretion in excluding this evidence.

Affirmed.